Bruce Lakety appearing on behalf of the petitioner. I thought what I would do first is open with a brief recap of the facts here. I know there's many intricate issues of the law, but I think there was the facts and the claims based on those facts may also be in danger of being swallowed up by that discussion, unless I at least treat them summarily here. The petitioner came to this country with his half-brother after being in hiding in Venezuela. And the reason he was in hiding was because he had escaped military training, which he believed, whether rightly or wrongly, was unjust in his case. He had been forcibly recruited from the street, and he had claimed that he, being the main support for his family, should not be subjected to military training, and made that protest repeatedly during his training. He then escaped because he and his half-brother were brutalized during training. He was repeatedly full of human excrement, forced to injure himself by being forced to do somersaults over cement uneven surfaces, being forced to stand on his head until his hair fell out. And he witnessed, or he became aware, that his half-brother was hung by his hands with lasting damage to his half-brother's shoulders. All of this came out before the immigration judge pooh-poohed that as normal military training, or apparently the just desert for what she termed the petitioner's insolence. That is the initial error of the immigration judge, not to recognize that conduct as persecution, and moreover, not to recognize it as persecution on account of imputed political opinion. What is a political opinion imputed? There is a presumption in this court, in this circuit, that when there is no evidence of a legitimate prosecutorial purpose for a government's harassment, or a government officer's harassment of an individual, that the motive is political. He was protesting being drafted off the streets. No evidence of a legitimate governmental motive for his persecution, though, Your Honor, in light of that. No, for his, well, no, for his, for what happened to him, let's just, let's use that term, for what happened to him, for his treatment. The case by Judge Reinhardt said where there is a prosecution in a foreign country with no legitimate basis for it, then we can presume that it was motivated by political considerations. That's in the case where somebody is being prosecuted, say, back in the Philippines, and he wasn't there at the time of purported crime being committed, and there's no basis for prosecuting him other than his political allegiances, which are, in other words, otherwise proved. But this gentleman, if I remember the record correctly, specifically said, I'm not political . He eschewed any political basis. I mean, is there something in here that he was against the Chavez regime or something? I'm not sure his statement was ever that broad, Your Honor. I know he did make a similar-sounding statement. But I'm not basing this on what you have indicated as Judge Reinhardt's decision. I think that the language in the Navas case, which I've cited, talks about a government's without there appearing to be legitimate prosecutorial purpose, and that would apply to these episodes that the Petitioner underwent during military training, then there is a presumption that the motive is political in the absence of rebuttal. That presumption arose here. It was not effectively rebutted. And therefore, there was imputed political opinion, regardless of whether Petitioner himself might have said, well, I'm not really a part of the active politics of this country. He was trying to resist military training. Well, let's assume he suffered. I mean, the acts sound pretty horrible. But if we say this is military discipline, this does not amount to torture. It's simply military discipline. How can the Petitioner show that he would be specifically targeted, he as opposed to all members of the Army, if he returned? Your Honor, I don't believe he has a burden to show that he's going to be, well, let me take that back. I think he has shown that prisoners in Venezuela are subject to torture and mistreatment. I think it is also clear, it's undisputed, that he is going to be prosecuted and confined if he is forcibly returned to Venezuela. Given those two things, he has showed specifically with respect to his own case, where the government has already mistreated him during military training, that he faces not only torture, but at the very least, I was assuming that the mistreatment was part of military discipline and did not amount to torture. If we find it did not amount to torture, then the burden is on him to show that he would be specifically targeted for torture. Isn't that correct? And, Your Honor, I would still submit that he has met that burden by the evidence submitted that in Venezuela, there is persecution in prisons. Your position? My position was that aside what happened to him, aside from what happened to him, that the country reports or the international reports or whatever show that people sent to prison are tortured in Venezuela, and that the BIA or the IJ in this case only dealt with his individual claim of what happened to him in this case and didn't adequately deal with the issue of torture in the country in general, in its prisons. And you said that this would require a remand, not a determination by us, but that your position was that the BIA's decision didn't adequately deal with the issue of torture, and that you did carry your burden of saying that if he were sent back, that he would more than likely be sent to prison, where anybody sent to prison would be subject to torture. That's correct, Your Honor. Essentially, the IJ was looking for him to prove that military deserters had been tortured in prison, which is an almost impossible burden for somebody to meet. I mean, you don't, you know, that kind of information will not necessarily be available. Our contention was that it's sufficient that you show that people are tortured and persecuted in prisons and that he's going to be sent there. And particularly with the history here, where he has escaped military training. In which case, your theory is you don't have to show that he would be singled out for torture, but that he would be an individual who would be sent to the prison system in which torture occurs. That's correct. That's the position with respect to future persecution. And you're saying that the country can use a report of the Department of State saying that all persons being put in prison in Venezuela suffer torture? No, I'm not saying that all persons do. Then I'm missing something. I'm saying that torture and persecution are documented in Venezuelan prisons. As to military deserters? No, not as to military deserters, because there wasn't that level of specificity available. However, in the circumstance of a military deserter, one can infer, through circumstantial evidence and through what happened in this case, and I would respectfully assert that one cannot say that this was simply a function of military discipline. But isn't that question that Judge Bay is raising, and that you're raising, a question to be determined by the BIA rather than by the court at this point? But if you're correct that the BIA didn't adequately consider that issue the first time? Yes, indeed. With respect to that issue, I think there would have to be a remand. And the issue is that the BIA did not adequately consider whether this man, regardless of whether he was an army deserter, but since he would probably be imprisoned and an army deserter, would suffer torture as would people generally, although not all of them, in Venezuela. Is that the issue that you want the BIA to further consider? Yeah. But with respect to this narrow issue, I think the BIA failed to consider the unique facts here which would expose him to torture and persecution upon his return. Well, I thought you said we're not talking about unique facts. We're talking about prisoners generally. We're talking about unique facts which would expose him to persecution because of the treatment of prisoners generally, without necessarily specificity. Well, that goes to my question earlier, because as I read the BIA decision, they were distinguishing his case from the Nuru case. We agree with the IJ's conclusion, however, that the facts in that case are distinguishable from this case because they involve very specific evidence that the alien in that case was tortured as a dissident and would likely be tortured as a military deserter. No such specific evidence exists in the instant case, says the BIA. Accordingly, we find that the respondent was correctly denied withholding of removal under Article III of the Convention Against Torture. So they did deal with him specifically. Your Honor, they did not. However, with respect to that finding, I think the Ninth Circuit is in a position to say that that's simply flatly wrong, that there was sufficient evidence of mistreatment, maybe not rising to the same level as happened in the Nuru case. Then why should we remand if on the basis of this statement we say it's insufficient? What I'm asking is that the Ninth Circuit recognize that there was persecution in military, during military training. If you just say that this is military discipline, then obviously we may not be facing that issue. But I think it's obvious that that was more. Well, it would handle the torture issue. Yes. Not whether he was persecuted for his military, whatever his military problems were. That's a different question from the torture issue of whether he should be sent back to a prison in Venezuela. I believe he has proved that he's more likely than not subject to torture based on past torture. And so I'm asking this Court to recognize that he was tortured during military training and would be exposed to torture in prison. But I don't want to get bogged down in this issue. My time is going quickly here. And this is actually only one of about five different issues. And I think perhaps the other issues are certainly equally as strong. I mean, this is a case involving arriving aliens as well. This gentleman is married to a United States citizen at this point. He has a United States citizen child by this point, which is not a part of the record. But the immigration judge knew of the marriage but failed to give him the fair opportunity to apply for adjustment of law concerning arriving aliens, which we now know has proved wrong. This Court has recognized in the Bona versus Gonzalez decision. And the petitioner had at that time and has now the right to at least have the effect of his marriage and the effect of the marriage-based application considered by an immigration judge. And furthermore, since we cannot know what the immigration judge would have done, had she not committed the error of law on the arriving aliens issue, that is another reason why petitioner deserves it. That's correct. Correct. What are the grounds of that discussion? The immigration judge takes a look at Mr. Ortonia Garay and says, we've got too many Venezuelans here tonight. Your Honor, I'm not aware of any precedent that would allow her to use that consideration as part of her discretion. Is there some limit on her discretion? There is indeed. I think that's an arbitrary kind of assumption which would deny equal protection perhaps. If she has some reasonable basis for denying the discretion, do you be satisfied? No, I wouldn't go that far, Your Honor. I think that there are a number. I'm not prepared to list them all out with specificities. But I think case law has established a number of parameters, if you will, as to the discretion the immigration judge has on an adjustment application. You don't have to take any more time on that. Okay. This may also be a good time to address two of the government's positions, namely that there was no parole and that also that this whole consideration of adjustment would be barred by a false claim of citizenship, which the government I know has just submitted a new case on. With respect to both of those issues, I have outlined in my brief how there was a failure of due process with respect to petitioner's claims so that the immigration judge really never properly had those before her. But she did not make findings on those issues because she ruled instead that the law as to arriving aliens didn't require her to even reach those issues. So we don't really treat those, and I'm not going to spend a lot of time on them because I don't think that they were ever the subjects of a final decision that was essential to the immigration court's judgment. There are a number of intricate issues here regarding the regulation itself. I've listened to the argument of a prior counsel, and even though I agree with that position, I had not specifically argued that to this court. My argument is with the efficacy of the regulation itself. So I still want to reserve a few minutes to reply, but let me briefly state what those errors are. And actually, even prior to the regulation, I do want the court to take seriously the fact that the board dismissed the appeal here and that there are no grounds for a dismissal in the regulatory authority under these circumstances because the board's increasingly using that form to deal with underlying immigration decisions, and it's simply not supported by regulation. One-judge dismissals are governed by specific provisions in the regs which do not apply here, and that is reason by itself for remand. With respect to the regulation, Congress in the Homeland Security Act did permit the Attorney General to delegate certain functions to the Department of Homeland Security, and in fact mandated that be done. But the question here is we have contended, and then the provisions, statutory provisions... Why don't you speak up, counsel? I'm sorry. We have contended, and the provisions of the statutes make clear that this particular function of adjudicating adjustment of status applications by immigration judges was not among those delegated by Congress to the Homeland Security Secretary. It partly comes down to a question of what is a function, because the government has argued, well, if there's any reference at all in the Homeland Security Act to the adjustment of status, then all of the functions relating to adjustment of status got transferred. We have instead pointed out that where functions prior to the Homeland Security Act were divided between the Commissioner of Immigration Service and the Court, the Executive Office of Immigration Review, and Congress only explicitly referred to functions of the Commissioner in the Homeland Security Act, where it delegated to Homeland Security, then the AG's functions handled by the Immigration Court, by the EOIR, did not get transferred. That is key. Why do you say that? Because it appears that Congress did transfer authority from EOIR to DHS under the interim rule, not the Attorney General. It didn't transfer functions of, Congress in the Homeland Security Act did not transfer any of the functions of the EOIR to the Homeland Security, except, well, no, I don't think it transferred any of those functions of EOIR. It transferred only functions of the Commissioner of Immigration. And here the Attorney General is now trying to transfer a function that was, I don't think there's any dispute about it, historically by regulation exercised by the Immigration Court. It is trying to accomplish by regulation what it cannot do because Congress has not given that authority to it. May I reserve the last two minutes? We haven't reached everything, but thank you. Morning, Your Honors. Manuel Palau for the response in this case. There's three issues that were decided by the Asylum Court here, which are before the Court. First, the Court's finding that, the Board's finding that Mr. Ordonez-Guerre failed to establish that he was persecuted on account of a protected ground during the course of his military training and thus was not eligible for asylum. Secondly, the Court here denied his motion for a continuance regarding, based on his argument that he should be allowed to pursue a FOIA request and get access to his documents. As I understand it, principally to determine or prove that he was a paroled alien. Thirdly, the Court here, the Board rather, denied his motion to remand to have his status adjudicated before the Immigration Court because, before the Board decided, the Department of Homeland Security and the Attorney General issued the Interim Reg, which was referred to previously, which gives that jurisdiction or assigns that jurisdiction to USCIS, not the Immigration Court. Therefore, there was no purpose in reopening or remanding to the Court to adjudicate his status. Not to adjudicate, but again, it was not clear where this was to be decided until that regulation was issued. Once the regulation was issued, as you said, it had to be decided by USCIS. At that point, you can't remand to be determined by the BIA. Yes, sir. But you could remand so that the BIA could hold the case until the USCIS had made the decision. I'm not saying you had to, but I'm saying you could, which I think is what some of the petitioners are seeking to do now that it has to be decided by USCIS. They don't want to be deported in the meantime. Yes, but not this petitioner. This petitioner insists that the Interim Reg is invalid and that he has a right to have his adjustment adjudicated by the Immigration Court itself. Suppose he loses on that one. What's wrong with the suggestion made by Judge Reinhardt that the matter be sent back to the IJA so the IJA can exercise her discretion to grant a continuance long enough for this gentleman to apply to USCIS and get an adjustment status without having to go back to Venezuela? Well, number one, and generally speaking, I believe that's to be determined by the Attorney General. The Interim Reg is an Interim Reg. What they decided was who will be adjudicating these applications. It has also asked for comments on other aspects of the process, among them being the timing and the interplay of these two processes. The Attorney General and DHS are still considering that issue. Well, in the meantime, since it wasn't considered before, the question is whether we should remand so that while they consider that issue, they can consider what to do with the cases that are now caught up in this new process. I don't know whether you're familiar with the U visas or probably not. I've never heard of them until last calendar. But it's a similar problem with the U visas, which are the cases, the visas they give to people who may testify about a crime, usually an immigration crime, and they're going to testify as witnesses. And the USCIS determines whether they get the U visas pending to allow them to testify or not. In the meantime, we have the same problem with the BIA issuing deportation orders and what do you do about it? What do they do to stay here while the USCIS  I acknowledge the problem you're referencing, but that can be decided on a case-by-case basis. And I would point out here that Mr. Adoniz-Guerre, despite this reg going into effect in May of 2006, as I don't believe he's filed an application either. So he's had a year, over a year, where he could have filed for adjustment of status before USCIS, and he could have had a year to have that process. We might not even have that issue today. Doesn't one of the requirements apply for USCIS adjustment of status that he be paroled? No, I'm sorry. Whether you're paroled or not, whether he's paroled or not, he's an arriving alien. He's covered by the interim reg. What Bona involved arriving aliens, he's an arriving alien, whether he's paroled or not. The immigration judge said that. It doesn't matter whether you're paroled or not. At the moment, I can't adjudicate your adjustment because I don't have jurisdiction. Now that's been decided by the interim reg, and now as an arriving alien, which he has always been, he clearly can apply to USCIS. Without proof that he's on parole? Yes, sir. So this is not, I don't believe this is the case for the court to try to fashion a general remedy, a practical remedy, which the Attorney General and DHS is looking at now, because this applicant has not filed for adjustment before USCIS and may never file for And the previous case? I'm sorry? The previous case? The previous case was the same situation. Well, we don't know, do we? No, that wouldn't be in the record. I did check, I'm sorry, in this case I did check, no, I'm sorry, I was checking whether he filed something more with the board, and he has not. I don't know what Mr. I mean, his current attorney didn't know whether he filed or not. But neither of these cases, at least on the record before the court, present a situation where an arriving alien pursuant to the interim reg has filed for adjustment of status and has been caught in the squeeze that the court describes. That's just not before the court in these two cases, as I read the records. It's clearly not before the court in the Ordonez-Guerre case, this one. Well, it's kind of hard for him to have filed for the U.S.C.I.S. if he's taking the position in this case that the regulation is itself improper under the law. Well, that's the choice he's made. He's rolled the dice on that. Mr. Khalilu's not making that argument. So I believe that he's, I don't know why he hasn't filed. I don't think that that, I suppose he's trying to avoid an argument that you were saying he's waived it or whatever. But I don't think there's any, I think the analysis about the regulation being, interim reg being valid is laid out in our brief. I don't think it's all that complicated. I think it's pretty clear that by statute, under the Homeland Security Act, both DHS and the Attorney General have adjustment authority. There's not different kinds of it. There's only one kind of adjustment authority. Both have it. And that Congress authorized both entities to issue regulations or procedures as to how they're going to exercise it. And that's all that the interim reg is. They've said as between the two of us who hold all the adjustment of status authority given to us by Congress, we've decided that in this situation, U.S.C.I.S. will adjudicate status of arriving aliens removal proceedings and EOIR will not. And I don't think there's any subset of adjustment authority called EOIR adjustment authority that was given by the Attorney General over to DHS. I just don't understand that classification or distinction. I don't think it's real or valid. The authority that was given to both DHS and AEG is adjustment authority. They both have it. Perhaps if we were talking about the Attorney General and Department of Education who clearly has no adjustment authority, then we're talking about a transfer from AEG to the other. But that's not how I read what happened under the Homeland Security Act. So I think there's no doubt that both these entities have issued the interim reg, have authority to adjust status. They decided by regulation how it's going to be exercised procedurally. And that's a valid exercise of their authority. So I don't think there's too much question about the regulation being valid. Switching to the merits of the asylum claim here, I believe that the evidence does not compel the conclusion that Mr. Ordonez-Guerre was persecuted as a result of what happened while he was in basic training in the military. The context here is pretty clear. He wasn't a civilian who was singled out for no apparent reason and had these things done to him. He was conscripted off the streets and he was put into the military. So the context here is military basic training, which by its nature is harsh. And we're not endorsing the techniques of the Venezuelan military, but everything that happened to him was under the context of a soldier going through basic training. It happened to all of his fellow conscriptees. And he was not singled out. And as your Honor noted, there's no stated political opinion or purpose that was being punished here. He stated, I'm not a  And even if he did, there's no testimony that he ever communicated that to his commanding officers. He said, I don't belong here. I'm supporting my family. I shouldn't be in the military. Not a surprising reaction when you're taken off the streets. But he did not resist his service. He served. He went through basic training. This is not like a conscientious objector who says, I'm not going to serve. Do what you will to me. And then was punished as a result. Everything that happened here happened to everybody in basic training. And it was under the heading of military training. So I think that's the context we have to keep in mind here. And the evidence does not compel the conclusion that the things that happened to him rose to the level of persecution. Secondly, if I could have a moment, please. Regarding torture or future persecution, I believe the immigration judge and the board got it right. They did consider what's going to happen to him if he returns. And the country report information said that, yes, certain prisoners in Venezuela Where's the reference to the country report information in the BIA decision? I'm sorry. I'm referring to the immigration court's decision at the moment. I'm sorry. Did your honor read from the board decision? Yes. And the board decision, as I read it, only deals with his individual problem. Whether he, his claim, it says rose to the level of torture. It says none of the past incidents recounted in his claim rose to the level of torture. Then it talks about whether his case is distinguishable from Nuru. And they say the facts in his case are distinguishable from Nuru. And there's no specific evidence that he's going to be tortured. I don't find any reference to what the general conditions are and whether prisoners who are in a prison as opposed to the army are tortured in Venezuela. I apologize. I'm referring to the immigration court's opinion. She did state that the country report information noted that while there is torture in Venezuelan prisons, in some cases, she noted that there were two instances mentioned in the country report where military personnel were mistreated. And in both those cases, the officers responsible were prosecuted. Which decision? It's the board decision, your honor. There's no mention in the board decision of the country reports at all. And only an analysis of what happened to him individually. Well, I believe the Nuru case is controlling there. I think what the board looked at there, I mean, there's no indication the board did not look at the country reports, your honor. Well, they do mention the country reports. It says in there, well, the state department's country report on Venezuela indicates that the country has a pure, a poor human rights record and that there have been high profile cases of mistreatment of soldiers resulting in death. There is no evidence that military deserters are persecuted. They do mention that. Thank you, your honor. I appreciate that. Where is that? That is the paragraph above. Oh, three. That's the that's the they're talking about the persecution of yeah. But in Nuru, your honor, which the board did cite, that's a distinguishable here. Here, Mr. Ordonez-Guerre left the military. He deserted. There's no doubt about that. He admits it. And he's just another deserter. In Nuru, Nuru flagged attention to himself by, he joined willingly I believe, but during the course of a campaign at one point he stood up and said, I'm not going to fight in this I'm not going to serve it any further. He's a dissident. Yes, ma'am. And that is not true in this case. That's correct. Well, the paragraph above the one I was reading you, talks about persecution of deserters. It doesn't talk about what happens in prisons to prisoners generally, to any prisoners. This talks about what happens to military deserters. And the country report, what it says about general conditions for treatment of soldiers. I believe what it says, your honor, is going on from that point, is that deserters are generally prosecuted and serve a jail term of anywhere from 2, 3, 4 years and they're barred from the military. And there is no evidence in how often deserters are prosecuted or that they are subject to excessive punishment or torture. And it finishes that paragraph. I totally agree, obviously, your honor. But I believe the facts here that it was his burden to prove that he would be singled out as a deserter, when and if he was prosecuted upon his return and something exceptional would happen to him, there's just no burden of that. He's just a typical deserter who did not want to serve in the military and found the treatment too harsh and not to his liking, so he left. That's what a deserter is. There was no principled stand by Mr. Odoña-Garray regarding military service generally or conscientious objection or any kind of political opinion that he asserted. Let me ask you this basic question. If there is a claim of torture awaiting a man in Venezuela, as a general condition of anybody who gets imprisoned, is there a burden on the petitioner to provide that evidence? Yes, sir. He's the one that's asking for Was there any such evidence provided? No. He couldn't have provided any personal experience. To provide any country condition evidence that all persons or general in prison Venezuelans are generally tortured. Correct. The only evidence in the record is from the country report and it's to the effect I don't want to overstate it, but that certain people who are in Venezuelan prisons do get tortured. I don't believe the country report specifies what kind of prisoners or anything else, but torture happens on an unspecified basis in Venezuelan prisons. That's not mentioned in the BIA report in the BIA decision that generally people who are in Venezuelan prison get tortured. I accept if you're saying it is not, but it doesn't mean that they didn't consider that, Your Honor. I think what the board says is that he failed to sustain his burden of proof on that and there's more detail on that Again, we're reviewing the board decision, but I think there's a lot more detail on that in the immigration court's decision. Which we don't consider with this. I guess the problem is how you read the board decision. I think what they were looking at is whether there's an individual showing that he is likely to be tortured when he goes back to prison because he's likely to be singled out. There's no accuracy of the general condition of the people who get sent to prison in Venezuela are subject to torture. And that's something that you see when you consider that issue. The evidence he offered was the country conditions report. The question is whether the board really just looked at him as an individual and said we don't know, he hasn't shown that he himself will be subject to torture as a military deserter, or whether it considered the general issue of, and as you say, there may be more of consideration of that in the IJ's report, but it doesn't seem to have been considered in the BIA report. They don't seem to have considered that issue of what's the general condition in prisons. Is somebody who's sent back there going to be subject to torture? I think the issue before the court is, does the record evidence compel the conclusion that if Mr. Odoñez goes back to Venezuela and is prosecuted as a deserter seven years after the fact, and is jailed, is he going to be No, that's not the issue. Because that would only be the issue if we were going to decide that he should be granted relief. The issue as to whether the BIA should decide that question is did they already decide it, or should we remand it to them so that they may decide it? Your Honor, if you're saying that because they didn't specifically mention that in their order, that therefore they did not consider it, I don't think that that's, I understand what you're saying, but I would respectfully disagree and say that that doesn't mean they didn't consider it. They obviously read the immigration court's order, they had the record before them, and really it's a question of, the burden of proof here is on the petitioner. And there's nothing in the record There's nothing additional to be accomplished by remand. The record is before us, and there's nothing in that record, either testimonial or documentary or country condition evidence, that Mr. Odoñez-Garay, the applicant here, is more likely than not to be tortured in prison if he's convicted of desertion. Last question. Was that issue which we've been discussing now about the general condition of torture in the prisons raised by the petitioner in his brief before the BIA? I believe he's just saying that generally that, I'm sure he can speak for himself, but I believe he's generally saying that the board failed to consider the future aspects of what could happen to him, and that based on his treatment in basic training, which he characterizes as torture, that that is the indication that he's going to be singled out if he returns. I'm sorry. Was there any claim in the petitioner's brief that the general conditions of torture in A, existed, and B, would be applied to him not because he was a military deserter, but just because he was sent to jail? Your Honor, I don't believe there is, based on my recollection. Thank you, Your Honor. How about dealing with that first? Yes, I will deal with that first, and then I want to talk only about the regulation after that, if I may. But we did, in fact, raise the issue to the BIA of the general being subject to torture in Venezuelan prisons, and that this would impact the petitioner. So I don't have the certified administrative record with me to be able to cite it to you. I apologize, but it's in there. You raised it in your brief here? Yes, raised in the brief here, raised in the brief to the BIA. I am confident of that. I hope that the court does not move too I heard one of your honors say if we lose on that point. This regulation is ultra-virus. It is clear that it is ultra-virus. It was improperly promulgated. I'm going to read one statement from the federal regulations that accompany the promulgation. These provisions do not affect how the Secretary's or the Attorney General's subordinates may rule on the merits of the factual and legal issues in any particular removal proceeding. That was the excuse used for dispensing with a notice and comment period here. That is false. That is obviously false as proved in this very case. It certainly affects the merits of the factual and legal issues in any particular removal proceeding. Well, let me just ask about that. Even if we were to find the interim rule was invalid, how would this affect this case? The IJA had several reasons in exercising her discretion in denying Petitioner's continuance, i.e. records had been offered him. He could have looked at any of the records during that time. So even if the regulation is invalid, how would this really affect this case? The board's whole decision, the board's whole handling of the immigration court's decision is based on the efficacy of that regulation. The board said, you've got this new regulation in place we don't have to remand this to the IJA because you can go before the District Director. I'm claiming no. You can't go before the District Director because that's an improper regulation. It's improper on three counts. You can't apply it here because it's retroactive, which I haven't even gotten to. It was improperly promulgated and the Attorney General didn't get the authority pursuant to the Homeland Security Act. The immigration courts were stripped of the ability to decide adjustment applications of arriving aliens by this regulation. And that is a change from the status quo of the Homeland Security Act that Congress did not authorize, simply didn't authorize in the Homeland Security Act. With that, Your Honor, Your Honors, I will submit. Thank you. Thank you both very much. The case is arguably submitted. The court will take a brief morning recess.
judges: Nelson, Reinhardt, Bea